IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 7, 2006

**STATE OF TENNESSEE v. COREY FINLEY**

**Appeal from the Criminal Court for Shelby County**
**No. 03-05912     John P. Colton, Judge**

---

**No. W2005-02804-CCA-R3-CD  - Filed June 7, 2007**

---

A Shelby County jury convicted the defendant, Corey Finley, of attempted first degree premeditated murder, *see* T.C.A. § 39-12-101 (2006); *id*. § 39-13-202(a)(1), and aggravated assault, *see id*. § 39-13-102.  The court sentenced him to serve 23 years in the Department of Correction as a Range I, standard offender for the attempted first degree murder conviction and merged the aggravated assault finding of guilt.  Aggrieved of his convictions, the defendant appeals on four grounds: (1) that there was insufficient evidence to convict him of attempted first degree murder; (2) that the trial court erred in failing to fully charge the jury on circumstantial evidence; (3) that the trial court erred in failing to instruct the jury on all lesser included offenses; and (4) that the sentence was excessive.  After reviewing the record, we hold that the evidence was sufficient to convict the defendant of attempted first degree murder.  We also hold that the defendant waived the two jury instruction issues and hold that the trial court did not commit plain error by not instructing the jury more fully on the circumstantial-evidence-jury-instruction issue.  Finally, we hold that the sentence was not excessive.  Thus, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Robert Jones, District Public Defender; Jim Hale, Assistant District Public Defender (at trial); and Phyllis Aluko, Assistant District Public Defender (on appeal), for the Appellant, Corey Finley.

Robert E. Cooper, Jr., Attorney General & Reporter; Brian Clay Johnson, Assistant Attorney General; William L. Gibbons, District Attorney General; and Dennis Johnson, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

Viewed in the light most favorable to the State, the proof at trial showed that on January 15, 2003, the victim, Jevon Boyd, and his minor son patronized 2 Star Grocery Store[1] in Memphis. Sandra Williams testified that as she got out of her car, she saw the victim and his son get out of their car. The three approached the store's entrance where the defendant and two men were standing. Ms. Williams testified that one of the three men said something to the victim as he approached the store's only door. The victim replied, but he and his son entered the store behind her. Ms. Williams could not recall what was said.

Ms. Williams testified that the defendant and one of the other men entered the store behind the victim while the third man remained outside. She testified that the victim and his son waited in front of her in line to purchase their items, and the defendant stood behind her while the other man stood near the video machine. Ms. Williams testified that after the victim purchased his items, he and his son walked out the store's door.

As soon as the victim and his son walked out, the third man hit the victim, and the defendant and the second man ran out of the store. Ms. Williams testified that the victim looked as if he were preparing to defend himself, but he did not have a chance because the defendant and the second man "[were] all over [the victim]." She then saw the defendant shoot the victim, so she immediately ran outside, grabbed the victim's son, and took him inside the store.

Once inside the store, Ms. Williams attempted to calm the young boy while she watched from the store's window. She testified that when the defendant fired the shot, the other two men ran across the street, the victim ran across the store's parking lot to the edge of a field, and the defendant chased after the victim, shooting at him. After the shooting, the victim made his way back into the store.

On cross-examination, Ms. Williams testified that before the victim first entered the store, he asked the men, "What you looking at me for?" She said that the victim and the three men did not exchange words while the victim was in the store. Ms. Williams further testified that after the first shot, she saw the victim grab his stomach.

Chris Tolbert testified that he was inside the store when he saw the victim and the victim's son enter. He testified that he had gone to school and played basketball with the victim. Mr. Tolbert testified that he also saw the defendant, whom he knew as "A.K.," inside the store that evening, but he did not recall if other men were with the defendant. Mr. Tolbert stated that he and the victim had a brief conversation while the victim paid for his items. As the victim and his son opened the door, Mr. Tolbert heard the defendant say, "What's up with all this sh-- talking now, b---

---

[1] The transcript lists the grocery store's name as "Two Star"; however, an exhibited photograph shows the store's name as "2 Star." Thus, we will use this spelling.

h?" Then the defendant shot the victim with a revolver, and he and Ms. Williams grabbed the victim's son and brought him back into the store.

Mr. Tolbert testified that the victim ran from the store towards a field while being chased by the defendant, who was shooting at the victim. Mr. Tolbert testified that six shots were fired; he did not observe where the defendant went after the sixth shot.

Mr. Tolbert testified on cross-examination that he did not hear the victim arguing prior to entering the store. He further testified that the defendant left the store before the victim and his son. Mr. Tolbert testified that he did not see anyone else with the defendant and that the victim did not get hit prior to being shot. He also testified that the defendant's arm was extended while he shot and that the victim had to run towards the defendant to reach the field. After the shooting, the victim returned to the store and passed out on the store's floor.

Memphis Police Officer Edward Townsley testified that he responded to a shooting call on January 15, 2003, at 2 Star Grocery Store. When he arrived on the scene, he observed the victim lying face down on the store's floor. Officer Townsley testified that the victim was in "extreme pain" and unable to give a statement. Officer Townsley also observed the victim bleeding, but on cross-examination, he admitted that it was not a great deal of blood.

Memphis Police Lieutenant Cindy Capps testified that in January 2003 she was a sergeant in the general assignment bureau. She and a detective asked the "ward officer"[2] assigned to the 2 Star Grocery area whether he could direct them to "A.K." Using the information from the ward officer, Lieutenant Capps found the defendant's photograph in the police computer system and generated a photographic array, posting the defendant's picture along with five other men bearing similar characteristics. She then showed the photographic array to the victim two to three weeks after he was discharged from the hospital, and the victim identified the defendant as the man who shot him.

The victim testified that on January 15, 2003, he picked up his son at a relative's house after he got off work. The two then went to 2 Star Grocery Store for some snacks. The victim parked his car on the left side of the store about 15 to 20 feet from the door. The victim noticed "three guys staring [him] down when [he] got out of the car." Thus, when he and his son approached the store's door, he asked the men if they knew him. One man replied that no one could stop them from looking at him.

The victim and his son entered to store and collected their items. The victim testified that he saw Mr. Tolbert, but he did not speak to him because he did not know him. He also saw the defendant and one of the men enter the store. He watched them closely because as he entered the store, he heard one of the men say, "We're fixing to whip this n----r."

---

[2] Lieutenant Capps explained that a ward officer is an officer assigned to a certain area for a long period of time who becomes familiar with the community and its citizens.

After paying for his items, he and his son walked out the door, and the third man, who had remained outside, "sucker punched" him in the face. The defendant and the other man came out of the store, and the victim prepared to defend himself. However, he did not have a chance because he saw "some fire come out and [the defendant] hit [the victim] in [his] stomach." At that point, the victim was not aware that he had been shot in the stomach. He testified that a lady came out of the store and grabbed his son. The victim then began to run straight towards a field, and the defendant chased him. At that point, he felt the blood coming from his stomach and knew that he had been shot. The victim testified that he fell at the edge of the field, and the defendant, while standing over the victim in close range, shot him in the right buttock. The victim attempted to rise, but the defendant shot him in the back. Again, the victim attempted to rise, and the defendant shot him in the arm.

The victim was unsure how many shots the defendant fired, but he was certain that the gun used by the defendant was a revolver. He testified that the defendant fired all shots from close range. After the shooting stopped, he ran back inside the store to find his son and to tell the store clerk to call the police and an ambulance. The victim remembered Officer Townsley trying to talk to him inside the store, and all he could say was that he wanted an ambulance. The victim was hospitalized for 10 days, and after his release, he identified the defendant as the shooter when Lieutenant Capps showed him the photographic array.

On cross-examination, the victim testified that before entering the store, he asked the three men, "Do ya'll know me?" He heard one man say that he was going to fight the victim; however, he did not inform the store clerk to call the police. The victim admitted that after the first punch, he cursed the man and asked him, "What's up?" He denied saying, "I got something for you. I'm going to get my 40." The victim emphasized that when he ran, he ran from the victim not towards him.

The defendant testified that he was at 2 Star Grocery Store on January 15, 2003, with two men from the neighborhood. The victim parked his car on the left side of a van that was parked in front of the store's door. The defendant said that the victim stated, "What ya'll looking at? Ya'll know me or something?" One of his friends replied, "You can't stop no one from looking at you." After they "had a little dispute," in which the defendant did not participate, the victim and his son entered the store.

The defendant and one friend also entered the store after the other friend said that he was going to hit the victim when the victim left the store. While inside, the defendant and his friend started playing a video game. The defendant testified that no words were exchanged inside the store.

As the victim and his son left the store, the defendant's friend, who had remained outside, hit the victim, so the defendant went outside to watch the fight. The defendant testified that the victim backed up towards his car and said, "I got some . . . ([i]ndiscernible.) I'm fixing to get this . . . ([i]ndiscernible.) I got something for you Bs." The defendant saw the victim reaching for

the "knob or something like that"; thus, he shot the victim in the stomach to prevent him from retrieving a gun.

After he shot the victim, his two friends ran. He stood behind the van and lost sight of the victim. The defendant then saw the victim approximately five feet from the victim's car, looking like "he was . . . concentrating." The defendant said, "When [the victim] was far out I started shooting at his legs far out." He intended to scare the victim away from his car. After the victim fell, the defendant "ran up over on him" and shot, intending to scare the victim to facilitate his escape. The defendant testified that he never meant to kill the victim.

On cross-examination, the defendant testified that his gun was a six-shot .32 caliber revolver which he carried for protection. The defendant testified that the victim's son was not with him when he left the store. He emphasized that he shot the victim to prevent the victim from retrieving a gun. He admitted that the victim did not have anything in his hands when he shot him. The defendant further testified that if he had wanted to kill the victim, then he could have shot him in the head.

The defendant admitted that one bullet can kill a person and that he shot six times. With the first shot, he intended to hit the victim, but he did not intend to hit him with the other shots. After the victim fell, he shot "by the ground beside [the victim]." He fired these shots "so [the victim would] cover his face or something like that and when [the victim] looked up, [the defendant would] be gone."

I. Sufficiency of the Evidence

Aggrieved of his attempted first degree premeditated murder conviction, the defendant claims on appeal that the evidence is insufficient because the State failed to rebut the defendant's claim of self defense and failed to prove "intent" and premeditation. We disagree.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). The rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

In determining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id*. at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State of Tennessee the strongest

legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

As relevant to the attempted first degree premeditated murder conviction, Tennessee Code Annotated section 39-13-202(a)(1) provides that "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2006). "'[P]remeditation' is an act done after the exercise of reflection and judgment." *Id*. § 39-13-202(d). Attempt, as relevant to first degree murder, occurs when a person, "acting with the kind of culpability otherwise required for the offense . . . acts with the intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-13-101(a)(2).

Self-defense is essentially a question of fact to be determined by the jury. *See State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). As such, "in the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *Clifton*, 880 S.W.2d at 743.

First, the defendant claims that the State failed to rebut the defendant's self-defense claim. The only proof at trial supporting the defendant's claim of self-defense was his testimony that the victim appeared to be moving towards his car to reach for a gun. However, the jury can accept or reject a claim of self-defense. *See State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). Given that the defendant shot the unarmed victim in the stomach while the victim was several feet from his car and then in the right buttock, back, and arm while the victim lay on the ground 15 feet away from his car, we conclude that the jury was well within its perogative to reject the defendant's claim of self-defense. *See State v. Leshaun Norwood*, No. M2003-00541-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Nashville, June 16, 2005) (holding that jury could reject self-defense claim when only the defendant and another witness testified the victim appeared to be reaching for a gun, and the defendant shot the victim in the back and the back of the head).

Second, the defendant claims the State failed to prove that he intended to kill the victim and failed to prove premeditation. Proof of premeditation is inherently circumstantial. The trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime. *See State v. Johnny Wright*, No. 01C01-9503-CC-00093, slip op. at 9 (Tenn. Crim. App., Nashville, Jan. 5, 1996). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g., State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660. In addition, evidence that the victim was retreating or attempting to escape during the shooting supports a jury's finding of premeditation. *Id*.

Here, the defendant shot an unarmed victim, and instead of fleeing with his friends, he remained at the store, gave chase while the victim was fleeing and offered no immediate threat, shot at the victim during the chase, and shot the victim as he lay on the ground. The victim attempted to rise three times, but the defendant continued to shoot the victim after each attempt from close range. Only when the defendant apparently fired all of his bullets did he flee the scene of the crime. The defendant even admitted that he did not want the jury to believe that every shot he fired hit the victim where he aimed, and he admitted that he intentionally shot the victim. The defendant acted intentionally and, from the surrounding circumstances, with premeditation, in attempting to kill the victim. Any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, and we hold the evidence sufficient.

## II. Jury Instructions

The defendant argues that the trial court erred in failing to fully charge the jury on circumstantial evidence and to instruct the jury on all lesser included offenses. However, these claims were not included in the defendant's motion for new trial.

Tennessee Rule of Appellate Procedure 3 specifically states that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . jury instructions granted or refused, . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e). Thus, the defendant waived both jury instruction issues because he failed to include them in his new trial motion.[3] In addition, the defendant failed to object to the omissions from the instructions at the time of trial; thus, he waived the issues. *See State v. Haynes*, 720 S.W.2d 76, 84-85 (Tenn. Crim. App. 1986).

The defendant does argue, however, in his reply brief that we should "consider the [failure-to-charge-circumstantial-evidence] issue under plain error analysis." He does not argue the same for the lesser-included-offenses issue; therefore, we decline to analyze that issue for plain error.

Before an error is recognized as plain error, it must be "plain" and must affect a "substantial right" of the accused. The term "plain" equates to "clear" or "obvious." *See United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 1777 (1993). Plain error is not error that is simply conspicuous; rather, it is especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings. *See State v. Wooden*, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983).

In *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994), this court defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the

---

[3]The defendant also failed to include his sentencing issue in his new trial motion; however, Rule 3 does not mandate inclusion of this specific issue. *See* Tenn. R. App. P. 3. Thus, we will address the sentencing issue on the merits later in the opinion.

proof of every element of the offense, and . . . constitutional in nature." *Id*. at 639. In that case, this court established five factors to be applied in determining whether an error is plain:

> (a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused [must not have waived] the issue for tactical reasons; and
>
> (e) consideration of the error must be "necessary to do substantial justice."

*Id*. at 641-42 (footnotes omitted). Our supreme court characterized the *Adkisson* test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain error. *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000).

The defendant argues that because the trial judge did not fully instruct the jury concerning circumstantial evidence regarding attempted first degree murder, the court's error is plain. The defendant contends that this failure denied the defendant his constitutional right to trial by jury and that consideration of the error is necessary to do substantial justice.

At trial, the trial judge charged, "Circumstantial evidence consists of proof of collateral facts and circumstances which do not directly prove the fact in issue but from which that fact may be logically inferred." The charge is the first sentence of Tennessee Pattern Jury Instruction 42.03, and the remainder, which was not charged in the present case, reads:

> . . . When the evidence is made up entirely of circumstantial evidence, then before you would be justified in finding the defendant guilty, you must find that all the essential facts are consistent with the hypothesis of guilt, as that is to be compared with all the facts proved; the facts must exclude every other reasonable theory or hypothesis except that of guilt; and the facts must establish such a certainty of guilt of the defendant as to convince the mind beyond a reasonable doubt that the defendant is the one who committed the offense. It is not necessary that each particular fact should be proved beyond a reasonable doubt if enough facts are proved to satisfy the jury beyond a reasonable doubt of all the facts necessary to constitute the crime charged. Before a verdict of guilty is justified, the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion and producing in effect a moral certainty that the defendant, and no one else, committed the offense.

T.P.I. - Crim. 42.03 (8th ed. 2007).

Although a judge's failure to instruct the jury on the law of circumstantial evidence is a fundamental reversible error when all incriminating evidence is circumstantial, *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975), if the evidence is both direct and circumstantial, the trial judge does not commit reversible error by failing to so instruct if not requested to do so, *see Monts v. State*, 214 Tenn. 171, 185-86, 379 S.W.2d 34, 42 (Tenn. 1964).

Both direct and circumstantial incriminating evidence was presented in this case. Ms. Williams, Mr. Tolbert, and the victim testified that the defendant shot the victim several times. Furthermore, the defendant testified that he intentionally shot the victim and continued to shoot after the victim started running towards the field. Because the evidence of guilt presented was both circumstantial and direct, we find no error, egregious or otherwise, in the trial court's failure to charge fully the jury on the law as to circumstantial evidence. *Monts*, 214 Tenn. at 185-86, 379 S.W.2d at 42.

III. Sentencing

The trial court sentenced the defendant on September 9, 2005, to 23 years in the Department of Correction.[4] He contends that this sentence is excessive; specifically, he argues that the trial court misapplied enhancement factor 11,[5] "[t]he defendant had no hesitation about committing a crime when the risk to human life was high," T.C.A. § 40-35-114(11) (2003), and that the trial court did not place proper weight on the mitigating factors, *see id*. § 40-35-113.

When the length, range, or manner of service of a sentence is disputed, it is generally the duty of this court to conduct a de novo review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d) (2006). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court considered

---

[4]The defendant did not waive his ex post facto protections and elect to be sentenced under the current sentencing law. The new sentencing scheme that became effective for offenses committed on or after June 7, 2005, and provided that "defendants who are sentenced after June 7, 2005, for offenses committed on or after July 1, 1982, may elect to be sentenced under the provisions of the act by executing a waiver of such defendant's ex post facto provisions." *See* 2005 Tenn. Pub. Acts ch. 353 § 18; T.C.A. § 40-35-102 (2006), Compiler's Notes.

[5]Tennessee Code Annotated section 40-35-114, as amended in 2002 by Public Act 849, § 2(c), effective July 4, 2002, added one enhancement factor and subsequently renumbered all of the original enhancement factors in the statute. Thus, for the time period during which the defendant's offenses were committed, the enhancement factor pertaining to the personal injuries of the victim as being particularly great was *subsection (7)*, the enhancement factor that the defendant employed a firearm was *subsection (10)*, the enhancement factor that the defendant had no hesitation in committing the crime where the risk to human life was high was *subsection (11)*, and the enhancement factor that the defendant committed an offense as a juvenile which was an equivalent to a felony if committed as an adult was *subsection (21)*. *See* T.C.A. § 40-35-114(7), (10), (11), & (21) (2003). We note that the legislature has, again, recently amended and renumbered the enhancement factors, *see* T.C.A. § 40-35-114 (2006), but these changes became effective for criminal offenses committed on or after June 7, 2005, and do not apply in this case.

the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appellant, and in the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely de novo. *Id*. If appellate review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Regarding enhancement factor 11, the Tennessee Supreme Court has consistently held that this factor should not be applied when the only person subjected to injury is the victim. *See State v. Makoka*, 885 S.W.2d 366, 373 (Tenn. Crim. App. 1994). However, this factor may apply "when other people present could have been injured." *Id*. In the present case, the defendant fired the first shot while the victim's minor son was at his side. The son was present and could have been injured by the bullet. Thus, the trial judge properly applied this enhancement factor. *See State v. Roland John Welch*, No. 01-C01-9601-CC-00005, slip op. at 9 (Tenn. Crim. App., Nashville, July 23, 1997) (finding that enhancement factor applied when shooting at the victim on a porch while victim was standing beside another person).

The defendant also contends that the trial court did not give proper weight to the facts that the defendant was "of a young age at the time of the offense and had subsequently attended rehabilitative programs on his own initiative" both of which "lend support to [the defendant's] potential for rehabilitation." *See* T.C.A. § 40-35-103(5) (2003). The defendant was 21 years old at the time of the offense, and neither evidence at trial nor evidence at the sentencing hearing showed the defendant "lacked substantial judgment in committing the offense." Moreover, the trial court reduced the defendant's sentence by one year for attending classes. We hold that the sentence was not excessive.

In accordance with the foregoing analysis, we affirm the defendant's conviction of attempted first degree murder, we hold that the trial court did not commit plain error in failing to instruct fully the jury on circumstantial evidence, and we affirm the sentence imposed by the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE